**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DONNA MCKENDRY, WILLIAM CONNORS and JOSEPH ADELMAN, individually and on behalf of the Inspira Health Network 403(b) Savings Plan, and all similarly situated Participants and Beneficiaries of the Plan,<br><br>Plaintiffs,<br><br>vs.<br><br>INSPIRA MEDICAL CENTERS, INC., BOARD OF TRUSTEES OF INSPIRA MEDICAL CENTERS, INC., and INSPIRA ADMINISTRATIVE COMMITTEE,<br><br>Defendants. | Case No. 1:26-cv-14001 |

**CLASS ACTION COMPLAINT**

Plaintiffs Donna McKendry, William Connors and Joseph Adelman ("Plaintiffs"), individually and as representatives of a class of similarly situated participants and beneficiaries of the Inspira Health Network 403(b) Savings Plan (the "Plan"), bring this Complaint for breach of fiduciary duties in the management, operation, and administration of the Plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3) and 1109(a), against the plan sponsor, Inspira Medical Centers, Inc. ("Inspira"), the

Board of Trustees of Inspira Medical Centers, Inc. (the "Board"), and the Inspira Administrative Committee (the "Administrative Committee" or "Committee") (collectively, the "Inspira Defendants").

**INTRODUCTION**

1. This action is brought by current and former participants in an ERISA-governed defined contribution retirement plan sponsored by Inspira to recover losses caused by the mismanagement of the Plan, including the imprudent selection and retention of investment options, the payment of excessive and undisclosed compensation to the Plan's recordkeeper, the improper and disloyal use of Plan participant forfeitures, prohibited transactions with a party in interest, and Inspira's failure to fund the Plan with contributions owed on wages that Inspira unlawfully failed to pay.

2. Defined contribution plans, such as 403(b) and 401(k) plans, have become America's primary private retirement system. Unlike traditional defined-benefit pension plans, in which the employer bears the investment risk and pays the plan's fees and expenses, the account balances in 403(b) plans rise and fall with the markets, and participants themselves bear both the market risk and the fees and expenses of the plan's investment options and administrative services. Every dollar of unnecessary fees, and every dollar of investment loss caused by imprudent

management, is a dollar that is permanently removed from a participant's retirement savings.

3. The marketplace for defined contribution plan services is mature and highly competitive. Large plans such as the Plan, which held more than half a billion dollars in assets and covered thousands of participants during the Class Period, command substantial bargaining power to obtain high-quality investment and administrative services at the lowest costs available to institutional investors. As ERISA fiduciaries, the Inspira Defendants were obligated to act solely in the interest of participants and beneficiaries, to defray only reasonable Plan expenses, and to select and monitor the Plan's investments and service providers prudently. 29 U.S.C. § 1104(a)(1).

4. The Inspira Defendants failed to discharge those duties in at least five interrelated respects.

5. *First*, the Inspira Defendants imprudently selected and retained the Plan's primary capital-preservation option, the Lincoln Financial Group Stable Value Account (the "Stable Value Account"), a general-account group annuity issued by The Lincoln National Life Insurance Company ("Lincoln"). The Stable Value Account held tens of millions of dollars of Plan assets in Lincoln's general account, exposing participants to Lincoln's single-entity credit risk while allowing Lincoln to retain undisclosed "spread" income — the difference between what Lincoln earned

on those assets and the below-market crediting rate it paid participants. Prudent fiduciaries of comparable plans obtained higher-crediting, lower-risk stable value products from competing providers.

6. *Second*, the Inspira Defendants imprudently selected and retained a set of actively managed investment options that charged fees for active management while delivering negative risk-adjusted returns and exposing participants to excessive risk, as measured by widely used Modern Portfolio Theory ("MPT") metrics. These options include the American Century Small Cap Value Fund (R6), the MFS Mid Cap Value Fund (R6), and the Western Asset Core Plus Bond Fund (I) (together with the Stable Value Account, the "Challenged Investments").

7. *Third*, the Inspira Defendants failed to monitor and control the compensation paid to Lincoln for recordkeeping and administrative services. The Plan paid Lincoln direct compensation that exceeded a reasonable per-participant fee, and the Inspira Defendants failed to account for the substantial additional, indirect compensation Lincoln received — including spread income on the Stable Value Account, float income on Plan cash, and revenue sharing from the Plan's investment options — none of which the Plan reported as indirect compensation on its Forms 5500.

8. *Fourth*, the Inspira Defendants improperly and disloyally used Plan participant forfeitures. The Plan document gave the Inspira Defendants a choice

among competing uses of those forfeitures. Rather than applying forfeited amounts—which are Plan assets—to reduce the recordkeeping and administrative expenses charged to participants' accounts, the Inspira Defendants used those Plan assets to reduce Inspira's own contribution obligations. They had a direct financial stake in that choice and made the same self-interested choice every year of the Class Period without any investigation, deliberation, or independent advice. Inspira was at all times financially sound and faced no risk of defaulting on its contribution obligations, so nothing about the Plan's circumstances justified using Plan assets to save Inspira money at the direct expense of the Plan and its participants.

9. *Fifth*, Inspira failed to fund the Plan with the employee salary deferrals and employer matching and other contributions that were owed on wages Inspira unlawfully failed to pay. As alleged in three separate wage-and-hour actions, Inspira systematically underpaid hourly employees in violation of the federal Fair Labor Standards Act ("FLSA") and New Jersey wage-and-hour law. Because Plan contributions are calculated as a percentage of compensation, Inspira's wage violations caused the Plan to be underfunded, and Inspira must make the Plan whole.

10. An ERISA fiduciary must discharge its duties "with the care, skill, prudence, and diligence" of a prudent person "acting in a like capacity and familiar with such matters." 29 U.S.C. § 1104(a)(1)(B). This requires a prudent process for selecting and monitoring the Plan's investments and service providers, for

controlling their costs, and for administering Plan assets — including forfeitures — solely in the interest of participants. The Inspira Defendants failed to employ such a process.

11. Plaintiffs do not challenge the Inspira Defendants' conduct with the benefit of hindsight. The information necessary to make prudent decisions — the Plan's own Forms 5500, fee disclosures, contracts, and readily available marketplace and fund-performance data — was available to the Inspira Defendants at all relevant times. The Inspira Defendants either failed to review that information or ignored it.

12. Each dollar of unnecessary fees and each dollar of avoidable loss compounds over a participant's career. The U.S. Department of Labor has estimated that, over a thirty-five-year period, a one-percent increase in fees and expenses can reduce a participant's ending account balance by twenty-eight percent.

13. Plaintiffs, individually and on behalf of the Class defined below, bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to enforce the Inspira Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty and prohibited transactions, to restore to the Plan any ill-gotten profits, and to obtain such other equitable and remedial relief as the Court deems appropriate.

## JURISDICTION AND VENUE

14. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which authorizes participants and beneficiaries to sue on behalf of a plan to remedy breaches of fiduciary duty and other violations of ERISA and to obtain monetary and appropriate equitable relief.

15. Section 1132(a)(2) authorizes a participant to sue in a representative capacity on behalf of the Plan to enforce a breaching fiduciary's liability under 29 U.S.C. § 1109(a).

16. This Court has subject-matter jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

17. Venue is proper in this District under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this District, at least one of the alleged breaches occurred in this District, and at least one Defendant resides or may be found in this District.

## THE PLAN AND THE PARTIES

### A. The 403(b) Plan

18. The Plan is a defined contribution retirement plan established under Section 403(b) of the Internal Revenue Code and governed by ERISA. The Plan permits employees to accumulate retirement savings through pre-tax and Roth salary

deferrals, employer contributions, and matching contributions, with tax-deferred growth until distribution.

19. The Plan is large. As of December 31, 2019, the Plan had 6,799 participants and $311,562,481 in assets; as of December 31, 2020, 7,326 participants and $452,290,516; as of December 31, 2021, 7,814 participants and $528,948,460; as of December 31, 2022, 8,386 participants and $465,973,641; and as of December 31, 2023, 9,883 participants and $560,054,069 in assets. (Form 5500 (2023) (2) at 38).

20. As a jumbo-sized plan, the Plan possessed the bargaining power to command highly competitive pricing for both investment management and recordkeeping and administrative services.

**B. <u>Plaintiffs</u>**

21. Plaintiff Donna McKendry resides in Laurel Springs, New Jersey, and was employed by Inspira as a Mammographer. During the Class Period, she participated in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. McKendry paid the recordkeeping and administrative costs complained of herein and invested in options that are the subject of this action, including the Lincoln Stable Value Account, the American Century Small Cap Value Fund, the MFS Mid Cap Value Fund, and the Western Asset Core Plus Bond.

22. Plaintiff William Connors resides in Newport, New Jersey, and during the Class Period was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Connors paid the recordkeeping and administrative costs complained of herein and invested in options offered by the Plan that are the subject of this action.

23. Plaintiff Joseph Adelman resides in Sicklerville, New Jersey, and during the Class Period was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Adelman paid the recordkeeping and administrative costs complained of herein and invested in options that are the subject of this action, including the American Century Small Cap Value Fund and the Western Asset Core Plus Bond Fund.

24. Plaintiffs have both statutory and constitutional standing. Section 1132(a) confers standing on a Plan "participant" to bring claims under 29 U.S.C. § 1109(a) in a representative capacity on behalf of the Plan. Plaintiffs also suffered concrete, particularized economic injury because excessive fees were charged to their individual accounts and their accounts were invested in imprudent options during the Class Period.

**C. <u>The Inspira Defendants</u>**

25. Defendant Inspira Medical Centers, Inc. is a New Jersey nonprofit corporation that operates a network of hospitals, surgery centers, and physician

practices, with its principal place of business at 165 Bridgeton Pike, Mullica Hill, New Jersey. Inspira is the Plan Sponsor and Plan Administrator and is a named fiduciary under 29 U.S.C. §§ 1002(16) and 1102(a).

26. Inspira has fiduciary responsibility to select and monitor the Plan's investment options and service providers and to control the Plan's administrative expenses.

27. Defendant Board of Trustees of Inspira Medical Centers, Inc. and each of its members is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) because the Board exercised discretionary authority to appoint, monitor, and remove the fiduciaries responsible for the Plan and its assets, and thereby had the concomitant duty to monitor its appointees.

28. Defendant Inspira Administrative Committee and each of its members is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A). The Administrative Committee was appointed by, and reports to, the Board and is directly responsible for selecting, monitoring, and removing the Plan's investment options and service providers, and for administering Plan assets, including forfeitures. The Committee - also identified as the Inspira Health Network Benefits Committee - generally meets four (4) times a year, and retained CAPTRUST, as an independent investment advisor. The Inspira Defendants thus had both the authority and the expert resources

to discharge their duties; their failures to do so, alleged below, did not result from any lack of information or advice.

29. Each of the Inspira Defendants exercised discretionary authority or control over the management and administration of the Plan and the management or disposition of Plan assets, and each is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

## THE INSPIRA DEFENDANTS' FIDUCIARY OBLIGATIONS

30. ERISA imposes on the Inspira Defendants the duties of loyalty and prudence, which are "the highest known to the law." A fiduciary must discharge its duties solely in the interest of participants and beneficiaries, for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(A)–(B).

31. The duty of prudence is a continuing one. Even in a participant-directed plan, fiduciaries must independently evaluate each investment option and remove imprudent options within a reasonable time; the availability of prudent options does not excuse retaining imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (holding that the availability of some prudent, low-cost investment options does not excuse a fiduciary's retention of imprudent ones, and reaffirming the fiduciary's

continuing duty to monitor plan investments and remove imprudent ones). The prudence inquiry is "context specific," and a plaintiff states a claim by plausibly alleging fiduciary decisions "outside a range of reasonableness." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (holding that an ERISA plaintiff pleads a breach of the duty of prudence by plausibly alleging fiduciary decisions "outside a range of reasonableness," without having to rule out every lawful explanation).

32. Prudence is "largely a process-based inquiry." A prudent fiduciary must conduct an independent investigation into the merits of each investment, review and understand the data underlying any advice on which it relies, use watch lists and consider alternatives, and periodically reevaluate the Plan's menu; a fiduciary may not blindly defer to advisers. *In re Quest Diagnostics ERISA Litig.*, 179 F.4th 217, 224-25 (3d Cir. 2026) (holding that the duty of prudence is "largely a process-based inquiry" requiring a fiduciary to investigate each investment independently and to analyze the bases of any expert advice rather than accept it blindly).

33. Adherence to these duties requires analyzing the risk-adjusted performance of the Plan's options and their managers and comparing them to available alternatives, using accepted measures such as Modern Portfolio Theory metrics — including alpha, beta, standard deviation, the Sharpe ratio, and up- and

down-market capture ratios — to determine whether an option delivers competitive returns for the risk imposed on participants.

34. Trust-investment principles warn fiduciaries against "bad risks — ones in which there is unwarranted danger of loss, or volatility that is not compensated by commensurate opportunities for gain." Restatement (Third) of Trusts § 90 (2007); see id. cmt. e(1). A fiduciary who disregards MPT metrics fails to undertake the reasoned evaluation prudence requires.

35. In selecting and retaining investments, fiduciaries must "avoid unwarranted costs," because "[c]ost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b (2007).

36. A fiduciary must also ensure that no more than reasonable compensation is paid to the Plan's service providers. In assessing reasonableness, the fiduciary must consider all compensation — direct and indirect — that the service provider receives "in connection with" its services to the Plan, from all sources, not merely the amounts the Plan pays directly. *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (holding that, in assessing whether no more than reasonable compensation is paid, a fiduciary must consider all compensation—direct and indirect—that a service provider receives in connection with the plan from all sources). A fiduciary of a large plan must benchmark those fees against the fees

paid by comparable plans for comparable services and must periodically subject the Plan's recordkeeping to competitive bidding. *Mator*, 102 F.4th at 185-86.

37. Plan assets must be held and used for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the Plan; they must never inure to the benefit of the employer. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A). Employer and matching contributions become Plan assets the moment they are paid into the Plan's trust and remain Plan assets after forfeiture because they stay in the trust. Under 29 U.S.C. § 1104(a)(1)(D), a fiduciary must follow plan documents only insofar as those documents are consistent with ERISA; the Plan's grant of discretion over the application of forfeitures therefore cannot license conduct that breaches the duties of loyalty and prudence. Participant forfeitures, once contributed to the Plan, are Plan assets, and a fiduciary's decisions about how to apply them are governed by ERISA's fiduciary duties, which trump the terms of the plan document. *Rodriguez v. Intuit Inc.*, 744 F. Supp. 3d 935, 943-44 (N.D. Cal. 2024) (holding that forfeitures which have become plan assets remain subject to ERISA's fiduciary duties, which trump the terms of the plan document, so that a fiduciary's decision how to apply them is a fiduciary act rather than a settlor function); *Struble v. N.J. Brewery Emps.' Welfare Tr. Fund*, 732 F.2d 325, 334-35 (3d Cir. 1984).

38. Whether the forfeiture-allocation decision breached the duty of prudence is a context-specific inquiry that turns on the circumstances prevailing at the time of each annual allocation. Plaintiffs' claim is tethered to the specific circumstances alleged in Section D below – including the Plan's permissible alternatives, the Inspira Defendants' conflict, the absence of any risk that Inspira would default on its contribution obligations, the lack of investigation or independent advice, and the resulting losses – and not to a categorical rule that forfeitures must always defray Plan expenses.

39. ERISA prohibits a fiduciary from causing the Plan to engage in a transaction that the fiduciary knows or should know constitutes a direct or indirect furnishing of services between the Plan and a party in interest, or a use of Plan assets by or for the benefit of a party in interest, unless an exemption applies and no more than reasonable compensation is paid. 29 U.S.C. §§ 1106(a)(1), 1106(b), 1108(b)(2). Lincoln, as the Plan's recordkeeper and service provider, is a party in interest under 29 U.S.C. § 1002(14).

40. ERISA imposes co-fiduciary liability. A fiduciary is liable for another fiduciary's breach if it knowingly participates in the breach, enables the breach through its own failure to comply with § 1104(a)(1), or knows of the breach and fails to make reasonable efforts to remedy it. 29 U.S.C. § 1105(a).

41. Under 29 U.S.C. § 1109(a), a fiduciary who breaches its duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach," to restore any profits made through use of Plan assets, and to such other equitable or remedial relief as the court deems appropriate, including removal.

## FACTUAL ALLEGATIONS

### A. The Inspira Defendants Imprudently Selected and Retained the Lincoln Stable Value Account

42. A stable value option is intended to protect participants' principal while generating returns above money-market rates. Throughout the Class Period, the Plan's stable value option was the Lincoln Stable Value Account, a general-account group annuity issued by Lincoln.

43. Stable value products differ materially in structure and risk. Synthetic stable value funds, in which the plan owns the underlying assets and principal is guaranteed by multiple "wrap" providers, carry the least risk. Separate-account products, in which assets are held in an insurer's segregated account, carry more risk but some protection from the insurer's general creditors. General-account products — like the Stable Value Account here — are the riskiest, because Plan assets are held in the insurer's unrestricted general account and are exposed to the claims of the insurer's creditors. These structural differences are central to a prudent fiduciary's evaluation.

44. Because the Stable Value Account is a general-account product, the Plan's investment is subject to Lincoln's single-entity credit risk: if Lincoln were to fail, participants would recover only as unsecured creditors. The Plan's own audited financial statements confirm that there are "no reserves against contract value for credit risk of the contract issuer or otherwise," and that the crediting rate is set by a formula that Lincoln reviews and resets annually in its discretion. (Form 5500 (2022) at 34)

45. Lincoln deposits the Stable Value Account's assets in its general account and earns a "spread" — the difference between the return Lincoln earns on those assets and the lower crediting rate it pays participants. The crediting rate is set in advance, reset by Lincoln, and not tied to the performance of a diversified pool of assets in which participants have an ownership interest. The Inspira Defendants therefore had both the opportunity and the duty to evaluate the prudence of retaining this option at least annually.

46. The Stable Value Account held large and growing amounts of Plan assets throughout the Class Period, guaranteeing Lincoln a substantial and steady base of general-account assets from which to earn spread income:

**Table 1**

| Plan Year End | Stable Value Account Contract Value |
|---|---|
| December 31, 2019 | $63,119,461 |

| | |
|---|---|
| December 31, 2020 | $71,627,508 |
| December 31, 2021 | $73,444,813 |
| December 31, 2022 | $76,056,013 |
| December 31, 2023 | $76,284,328 |

Sources: Forms 5500 for 2020–2023. (Form 5500 (2020) at 26; Form 5500 (2021) at 27; Form 5500 (2022) at 27).

47. A prudent fiduciary of a plan this size knew or should have known that lower-risk, higher-crediting stable value products — including synthetic and separate-account products offered by competing providers — were available in the marketplace and could have obtained better terms by demanding higher crediting rates from Lincoln or by soliciting competitive proposals. By selecting and retaining a general-account product with a below-market crediting rate, the Inspira Defendants exposed participants to unnecessary single-entity credit risk and to the erosion of their principal against inflation, while allowing Lincoln to retain excessive, undisclosed spread income.

48. The Inspira Defendants' own Investment Policy Statement confirms that they recognized these distinctions and the criteria a prudent evaluation demanded. Adopted by the Investment Committee on January 30, 2018, the Investment Policy Statement directed the Committee that it may consider, in selecting and monitoring any fixed interest or stable value option, the "financial strength ratings of the guarantor," the "interest rate history and minimum guaranteed contract rate," the "contract liquidity provisions," the "current and historical market

to book value ratio," and a "comparison between fixed interest accounts (*i.e.*, those backed by general assets) and stable value accounts (*i.e.*, those backed by separate account)." The Inspira Defendants thus committed in writing to perform the very general-account-versus-separate-account comparison and crediting-rate and financial-strength analysis that would have revealed the Lincoln Stable Value Account's inferiority, yet the documents produced reflect no such analysis.

**<u>Substandard Crediting Rates and Forgone Earnings</u>**

49. During the Class Period, the Plan received a substantially lower crediting rate on the Lincoln Stable Value Account than comparable plans obtained from general-account and less-risky separate-account stable value providers. Although the Lincoln Stable Value Account held tens of millions of dollars of Plan assets and grew steadily every year, its credited rate remained mired near its 1% contractual floor while prevailing market rates for competing stable value products rose. A comparison of the crediting rate on the Lincoln Stable Value Account to the MassMutual Separate Account Stable Value and the TIAA Traditional Annuity (General Account RC) is set forth in Table 2 below:

**Table 2**

| Time Period (Calendar Year) | Crediting Rate for Lincoln SVA in the Plan (%) | Crediting Rate for MassMutual Separate Account Stable Value (%) | Crediting Rate for TIAA Traditional Annuity (%) — General Account RC |
|---|---|---|---|
| CY 2020 | 1.82 | 4.03 | 3.80 |

| | | | |
|---|---|---|---|
| CY 2021 | 1.75 | 4.03 | 3.80 |
| CY 2022 | 1.96 | 4.71 | 5.08 |
| CY 2023 | 2.03 | 5.46 | 6.50 |
| CY 2024 | 2.30 | | |

Sources: Lincoln SVA crediting rate calculated as interest credited during the year divided by the end-of-year contract value (Form 5500 2020–2023, Schedule A, at 6). The MassMutual and TIAA crediting rates are alleged upon information and belief.

50. The crediting rate in a stable value annuity such as the Lincoln Stable Value Account is the most crucial component of the investment's performance, because it represents the minimum annual rate of return guaranteed to participants. A product offering a higher crediting rate provides participants a higher guaranteed minimum return and is therefore a better-performing investment for capital preservation.

51. The Lincoln Stable Value Account carried a guaranteed minimum interest rate of only 1.00%, and its credited rate rarely rose materially above that floor; as of September 30, 2024, its stated portfolio rate was just 2.30%. (INSPIRA HEALTH NETWORK 403B SAVINGS PLAN at 8) The crediting rate was set by a formula in Lincoln's discretion and reviewed only annually, and the Plan held "no reserves against contract value for credit risk of the contract issuer." (Form 5500 (2022) at 34)

52. As Table 2 shows, and upon information and belief, the crediting rate on the Lincoln Stable Value Account was dramatically lower than the crediting rates

offered by the comparable MassMutual Separate Account Stable Value and TIAA Traditional General Account Annuity in every year of the Class Period — by 2023, crediting participants barely one-third of what the TIAA product paid (2.03% versus 6.50%). Had the Inspira Defendants secured a crediting rate for the Lincoln Stable Value Account in line with the rates used by MassMutual and TIAA, participants would have earned substantially greater guaranteed returns.

53. The higher crediting rates offered by TIAA and MassMutual did not come at the price of greater risk. To the contrary, both TIAA and MassMutual carried higher S&P financial-strength ratings (AA+) than Lincoln (A+), so the better-performing alternatives were, if anything, safer than the Lincoln Stable Value Account the Inspira Defendants selected and retained.

54. The consequence of the Inspira Defendants' failure to obtain a competitive crediting rate is quantified in Table 3, which uses the Plan's actual assets invested in the Lincoln Stable Value Account and the higher crediting rates paid on the TIAA Traditional Annuity (General Account RC) to demonstrate the resulting forgone returns:

**Table 3**

| Year | Plan Assets Invested in the Lincoln SVA | Lincoln SVA Crediting Rate (%) | Return on Plan Assets at Lincoln Rate | TIAA Traditional Crediting Rate (%) | Return on Plan Assets at TIAA Rate | Forgone Return (TIAA − Lincoln) |
|---|---|---|---|---|---|---|
| FY 2020 | $71,627,508 | 1.82 | $1,305,603 | 3.80 | $2,721,845 | $1,416,242 |

| | | | | | | |
|---|---|---|---|---|---|---|
| FY 2021 | $73,444,813 | 1.75 | $1,287,403 | 3.80 | $2,790,903 | $1,503,500 |
| FY 2022 | $76,056,013 | 1.96 | $1,489,026 | 5.08 | $3,863,645 | $2,374,619 |
| FY 2023 | $76,284,328 | 2.03 | $1,547,830 | 6.50 | $4,958,481 | $3,410,651 |
| FY 2024 | | 2.30 | | | | |
| Total | — | — | $5,629,862 | — | $14,334,875 | $8,705,013 |

Sources: Plan assets (end-of-year contract value) — Form 5500 (2020) at 26; (2021) at 27; (2022) at 27; (2023) at 28. Return on Plan Assets at Lincoln Rate reflects the interest actually credited — Form 5500 (2020–2023), Schedule A, at 6. Return at the TIAA rate is the end-of-year contract value multiplied by the TIAA crediting rate for that year; the forgone return is the difference between that figure and the interest the Plan actually credited. TIAA crediting rates are alleged upon information and belief.

55. As Table 3 demonstrates, in each year of the Class Period the Plan earned far less on its stable value assets than it would have earned in the readily available TIAA Traditional Annuity, with the annual shortfall growing from approximately $1.4 million in 2020 to approximately $3.4 million in 2023. In the four years alone for which the Plan's Forms 5500 report the interest credited (2020–2023), participants forwent approximately $8.7 million in returns they would have received had the Inspira Defendants secured the crediting rate available through the TIAA Traditional Annuity — and approximately $8.0 million measured against the MassMutual Separate Account Stable Value — sums that would have compounded in participants' accounts over time.

56. These losses were entirely avoidable. Because the Plan held more than half a billion dollars in total assets and consistently more than $76 million in the

Lincoln Stable Value Account, the Inspira Defendants possessed substantial bargaining leverage to demand a higher crediting rate from Lincoln or to solicit competitive proposals from TIAA, MassMutual, and other providers offering higher-crediting, equally or less risky stable value products. Their failure to exercise that leverage, and their retention of a general-account product paying a near-floor crediting rate, caused the Plan and its participants millions of dollars in forgone, compounding returns.

57. The Lincoln Stable Value Account's substandard crediting rate did not result from any feature unique to the Plan or from any greater risk borne by its participants. During the Class Period, comparable plans that offered fully benefit-responsive general-account and separate-account stable value products — including the Ameritas 401(k) Retirement Plan and the Shands Jacksonville Retirement Plan — obtained materially higher crediting rates than the Plan, as set forth in Table 4:

**Table 4**

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| CY 2020 | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Insurance Company | 3.48% |
| CY 2020 | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
| CY 2020 | Inspira Health Network 403(b) Savings Plan | 7,326 | $452,290,516 | Lincoln National | 1.82% |

| | | | | | |
|---|---|---|---|---|---|
| CY 2021 | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Insurance Company | 3.43% |
| CY 2021 | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
| CY 2021 | Inspira Health Network 403(b) Savings Plan | 7,814 | $528,948,460 | Lincoln National | 1.75% |
| CY 2022 | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Insurance Company | 3.30% |
| CY 2022 | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
| CY 2022 | Inspira Health Network 403(b) Savings Plan | 8,386 | $465,973,641 | Lincoln National | 1.96% |
| CY 2023 | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Insurance Company | 3.66% |
| CY 2023 | Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| CY 2023 | Inspira Health Network 403(b) Savings Plan | 9,883 | $560,054,069 | Lincoln National | 2.03% |

Sources: Inspira participant counts and total plan assets — Forms 5500 for 2020–2023; the Lincoln SVA crediting rate is calculated as interest credited divided by the end-of-year contract value (Form 5500 (2020)–(2023), Schedule A, at 6). The comparator plans' participant counts, plan assets, and crediting rates are drawn from those plans' Forms 5500 and are alleged upon information and belief; where a plan's Form 5500 does not separately state the crediting rate, the calculated yield is interest credited divided by the end-of-year contract value.

58. By failing to exercise the Plan's substantial economic leverage to secure a competitive crediting rate, and by treating the Plan's stable value investment passively, the Inspira Defendants violated their duty of prudence and caused the Plan demonstrable losses in foregone investment income compared to what a prudent fiduciary would have obtained under like circumstances.

59. Throughout the Class Period, the Lincoln Stable Value Account underperformed the average crediting rate of the comparator funds identified in Table 4 by an average of more than 51 percent, as demonstrated in Table 5:

**Table 5**

| Year | Lincoln SVA Rate of Return in the Plan | Comparator Average Rate of Return | Lincoln SVA Percentage of Underperformance in the Plan |
|---|---|---|---|
| CY 2020 | 1.82% | 3.91% | 53.45% |
| CY 2021 | 1.75% | 3.93% | 55.47% |
| CY 2022 | 1.96% | 3.80% | 48.42% |
| CY 2023 | 2.03% | 3.99% | 49.12% |
| Average Underperformance During Class Period | — | — | 51.62% |

Sources: The Comparator Average Rate of Return is the average of the Ameritas and VALIC crediting rates shown in Table 4 for each year; the percentage of underperformance equals the comparator average less the Lincoln SVA rate, divided by the comparator average.

60. The dramatic disparities between the Lincoln Stable Value Account's crediting rate and those of the comparators in every year demonstrate that neither the type of guaranteed investment contract nor any theoretical difference in risk can explain the Lincoln Stable Value Account's dismal crediting rate. The comparators were fully benefit-responsive, presented similar risk considerations based on the creditworthiness of their insurance carriers, and had their crediting rates reviewed in the same prevailing market and economic conditions as the Lincoln Stable Value Account.

61. Other traditional guaranteed investment contracts with characteristics similar to the Lincoln Stable Value Account — including several issued by Lincoln National itself to other retirement plans — credited materially higher rates than the Plan received during the Class Period, as demonstrated in Table 6:

**Table 6**

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| CY 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| CY 2020 | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| CY 2020 | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| CY 2020 | Inspira Health Network 403(b) Savings Plan | 7,326 | $452,290,516 | Lincoln National | 1.82% |
| CY 2021 | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| CY 2021 | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| CY 2021 | Inspira Health Network 403(b) Savings Plan | 7,814 | $528,948,460 | Lincoln National | 1.75% |
| CY 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| CY 2022 | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| CY 2022 | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| CY 2022 | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| CY 2022 | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life | 3.67% |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Insurance Company | |
| CY 2022 | Inspira Health Network 403(b) Savings Plan | 8,386 | $465,973,641 | Lincoln National | 1.96% |
| CY 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| CY 2023 | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| CY 2023 | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| CY 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| CY 2023 | Inspira Health Network 403(b) Savings Plan | 9,883 | $560,054,069 | Lincoln National | 2.03% |

Sources: The comparator plans' participant counts, plan assets, insurance carriers, and crediting rates are drawn from those plans' Forms 5500 and are alleged upon information and belief; where a plan's Form 5500 does not separately state the crediting rate, the calculated yield is interest credited divided by the end-of-year contract value. Inspira figures are from the Plan's Forms 5500 and the calculated Lincoln SVA yield.

62. A prudent fiduciary would have known that Lincoln and other providers of fixed annuities offered substantially identical, better-performing stable value investments, and could have obtained them simply by demanding higher crediting rates from Lincoln or by submitting the Plan's stable value investment to competitive bidding. That Lincoln National itself paid substantially higher crediting rates to other, similarly situated retirement plans confirms that higher rates were readily available to the Plan.

63. The Inspira Defendants in fact had this market information directly

before them. In July 2020, at the outset of the Class Period, Inspira solicited competitive proposals from eight recordkeepers — Lincoln (the incumbent), AIG, Empower, Fidelity, MassMutual, Prudential, TIAA, and Voya. (Cammack RFP Finalist Comparison Report at 6). The resulting analysis showed that competing insurers offered fixed-account and stable value products carrying the same 1.00% minimum guarantee but higher current crediting rates than Lincoln's — including the TIAA Traditional Annuity (Retirement Choice), which credited 2.75% net of fees against Lincoln's 2.00% — and that those competitors carried financial-strength ratings equal to or higher than Lincoln's, with TIAA rated A++/AAA/Aa1/AA+ against Lincoln's A+/A+/A1/AA-. (Cammack RFP Finalist Comparison Report at 20–23) The same analysis revealed that from 2015-2019, Lincoln's historical rates fared even worse. For example, the TIAA Retirement Choice offered crediting rates from 3.99% to 4.28% during that period, even as Lincoln failed to exceed a rate of 2.10% in any year.

64. The Inspira Defendants nonetheless retained the Lincoln Stable Value Account at its near-floor crediting rate.

65. The Inspira Defendants were also told the Account's crediting rate quarter after quarter by their own investment adviser. CAPTRUST's quarterly reviews reported that the Lincoln Stable Value fund held approximately $77 million — 11% to 12% of Plan assets — and credited only 2.30% as of the second quarter

of 2024 and 2.20% as of the third quarter of 2024. (CapTrust 2nd Quarter 2024 Review; CapTrust 3rd Quarter 2024 Review). Despite receiving this information at each quarterly meeting, the Inspira Defendants neither demanded a higher crediting rate nor put the Plan's stable value investment out for competitive bid, and instead retained the Account unchanged.

### B. The Inspira Defendants Imprudently Selected and Retained Actively Managed Funds That Charged Fees for Active Management While Delivering Negative Risk-Adjusted Returns and Exposing Participants to Excessive Risk

66. In addition to the Stable Value Account, the Inspira Defendants selected and retained a number of actively managed funds that charged participants the higher fees associated with active management. A prudent fiduciary who pays a premium for active management must monitor whether the manager actually delivers value commensurate with that premium and with the risk imposed on participants — that is, whether the fund generates positive risk-adjusted returns (measured by, among other things, alpha) rather than merely tracking or trailing its benchmark while taking on greater risk.

67. The Inspira Defendants failed to conduct that analysis for the American Century Small Cap Value Fund (R6), the MFS Mid Cap Value Fund (R6), and the Western Asset Core Plus Bond Fund (I). These funds charged active-management fees yet, over sustained multi-year periods, produced negative alpha relative to their benchmark index — meaning the manager destroyed, rather than added, risk-

adjusted value — while exposing participants to risk at or above that of the fund's category, as shown by MPT metrics.

68. Here again, the Inspira Defendants' own Investment Policy Statement prescribed the very analysis they failed to perform. It directed the Committee to evaluate each option's "risk-adjusted return measures," its "risk measures versus those of the benchmark and/or peer group," its three-year standard deviation and three-year Sharpe ratio, and whether its expense ratios were "Consistent with peer group median," and to place options that "consistently do not meet the Committee's expectations" on "watch" as "candidates for replacement." (Investment Policy Statement at 3). The Modern Portfolio Theory metrics set out below show that the Challenged Investments failed those criteria.

69. The expense ratios of these actively managed funds, and their total returns compared to their benchmark indices, are set forth below:

**Table 7**

| Fund (Share Class) | Net Expense Ratio | Category Median Expense Ratio | 1-Yr Return | 5-Yr Return | 10-Yr Return | Benchmark Index (1/5/10-Yr) |
|---|---|---|---|---|---|---|
| American Century Small Cap Value (R6) | 0.74% | 1.01% | 24.65% | 5.42% | 11.18% | Russell 2000 Value: 43.01% / 8.23% / 10.89% |
| MFS Mid Cap Value (R6) | 0.62% | 0.75% | 19.87% | 9.52% | 10.61% | Russell Mid Cap Value: 26.22% / |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | 9.67% / 10.33% |
| Western Asset Core Plus Bond Fund (I) | 0.44% | 0.76% | 3.71% | −1.36% | 1.65% | Bloomberg US Universal TR USD Index: 4.15% / 0.44% / 1.95% |

Sources: Plan participant fee disclosure and Morningstar Managed Investment Reports. (INSPIRA HEALTH NETWORK 403B SAVINGS PLAN at 9; American Century Small Cap Value Fund R6 Report; MFS Mid Cap Value Fund Class R6 Report, Western Asset Core Plus Bond Fund Class I Report).

70. As the table reflects, the American Century Small Cap Value Fund substantially trailed its Russell 2000 Value benchmark over the one- and five-year periods, the MFS Mid Cap Value Fund trailed its Russell Mid Cap Value benchmark across the one- and five -year periods, and the Western Asset Core Plus Bond Fund trailed its Bloomberg US Universal TR USD benchmark across the one-, five - , and ten-year periods, notwithstanding the active-management fees participants paid.

71. More telling than raw returns are the funds' Modern Portfolio Theory risk metrics, which demonstrate that the funds subjected participants to excessive risk without commensurate reward. Negative alpha means a fund underperformed the return that its level of market risk (beta) would predict; a beta above 1.0 and an above-category standard deviation mean greater volatility; a down-market capture ratio above 100% means the fund lost more than its benchmark in declining markets;

and a Sharpe ratio below 1.0 means the fund's returns are low relative to the volatility and risk. The Challenged Investments' MPT metrics were as follows:

**Table 8**

| Fund | Alpha (3-Yr / 5-Yr / 10-Yr) | Beta (10-Yr) | Std. Deviation | Sharpe Ratio (3-Yr) | Down-Market Capture (3-Yr) | Morningstar Risk vs. Category |
|---|---|---|---|---|---|---|
| American Century Small Cap Value (R6) | −7.43 / −4.98 / −4.47 | 1.14 | up to 21.87% | 0.21–0.47 | 139.74% | Above Average |
| MFS Mid Cap Value (R6) | −2.71 / −1.61 / −3.49 | 0.99 | 14.05% (3-Yr) | 0.61 | 99.32% | Portfolio Risk Score 73 (Aggressive) |
| Western Asset Core Plus Bond Fund (I) | −0.02 / 0.10 / 0.43 | 1.33 | 7.43% (3-Yr) | − 0.08 | 136.34% | High |

Sources: Morningstar Managed Investment Reports (alpha, beta, standard deviation, Sharpe ratio, capture ratios, and risk ratings). (American Century Small Cap Value Fund R6 Report; MFS Mid Cap Value Fund Class R6 Report; Western Asset Core Plus Bond Fund Class I Report).

72. The American Century Small Cap Value Fund is the starkest example. Over the three-, five-, and ten-year periods it generated deeply negative alpha (−7.43, −4.98, and −4.47), a ten-year beta of 1.14, an above-category standard deviation, and a three-year down-market capture ratio of 139.74% — meaning it captured nearly 140% of its benchmark's losses in down markets while capturing only a fraction of the upside. Morningstar rated the fund's risk "Above Average" and assigned it only a "Neutral" rating. A fiduciary employing a prudent, MPT-based process would have recognized that participants were bearing above-market risk for negative risk-adjusted returns and would have replaced the fund.

73. The MFS Mid Cap Value Fund likewise exposed participants to elevated, category-aggressive risk (carrying a Morningstar Portfolio Risk Score of 73, in the "Aggressive" range), with negative alpha across all measured periods. The Inspira Defendants retained this fund without evaluating, or despite ignoring, whether its risk-adjusted returns justified its continued inclusion in the Plan's menu.

74. Lastly, the Western Asset Core Plus Bond Fund generated high volatility and sub-par returns, negative alpha, a negative Sharpe ratio, down-market capture ratio of 136.34%, and a "High" risk ranking.

75. In May 2024, the Inspira Defendants belatedly agreed to replace the Western Asset Core Plus Bond Fund with the less expensive (0.33% expense ratio), less volatile and better-performing Dodge & Cox Income Fund. A prudent fiduciary would have made this change many years earlier. Other alternatives, such as the Weitz Core Plus Bond Fund, exceeded the growth of the Western Fund by more than 3% from 2015-2021 while maintaining lower volatility and better Sharpe ratios.

76. The Western Fund's high volatility arose, in part, from its long average maturity and duration of the bonds in its portfolio compared to peers. This "persistent long-duration bet" exposed the Western Fund's investors to 34% losses in 2022.[1] The Western Fund's volatility is exacerbated by its exposure to Russian bonds. In

[1] https://www.morningstar.com/markets/markets-brief-these-funds-fared-worst-bond-market-selloff.

March 2022, an article observed that the Western Fund was "one of the worst-performing funds in [its] category . . . largely because of its higher allocation to emerging markets, including Russian local debt and the Russian ruble, and 'its much longer duration' as [interest] rates rose in early 2022 . . . ."[2]

77. Other fiduciaries spotted these problems years before the Inspira Defendants. During every quarter from 2016 to 2024, the Western Fund experienced net capital outflows, meaning more money left the fund than was invested in it. These outflows signaled widespread skepticism of the fund's prospects. Rather than heed this early warning, the Inspira Defendants retained the Western Fund through May 2024, causing participants to incur substantial losses.

78. A prudent fiduciary applying accepted risk-adjusted performance analysis would have identified the deficiencies in the Challenged Investments and would have replaced them with prudent alternatives offering superior risk-adjusted returns. The Inspira Defendants' failure to do so reflects the absence of a prudent process for selecting and monitoring the Plan's investment options.

### C. The Inspira Defendants Failed to Monitor and Control Excessive and Undisclosed Compensation to Lincoln for Recordkeeping and Administrative Services

79. Recordkeeping is a commoditized, highly competitive service, and its cost turns primarily on the number of participants, not the amount of plan assets.

[2] https://www.thewealthadvisor.com/article/37-billion-us-bond-fund-emerges-big-loser-russia.

Large plans can command low per-participant recordkeeping fees. A prudent fiduciary of a large plan must benchmark recordkeeping compensation against comparable plans, periodically solicit competitive bids, and consider all of the recordkeeper's compensation from every source.

80. The Inspira Defendants' 2020 request for proposals confirms both that materially lower-cost recordkeeping was readily available and that Lincoln's compensation was tied to its proprietary Stable Value Account. In the RFP responses, competing providers quoted far lower recordkeeping revenue than Lincoln — MassMutual offered to provide recordkeeping for as little as $0 per participant (0 basis points), and Voya, TIAA, and Prudential quoted best prices of $104,400 (3 basis points), $135,720 (3.9 basis points), and $139,200 (4 basis points), respectively — while Lincoln's quote of 5 basis points, or $40 per participant, was expressly conditioned on the Plan's "continued use of Lincoln Stable Value Account." (Cammack RFP Finalist Comparison Report at 37, 42). Moreover, Lincoln was the only of the eight bidders that required the Plan to retain a proprietary investment product. (Cammack RFP Finalist Comparison Report at 18). That arrangement tied Lincoln's recordkeeping compensation to the retention of the very general-account product from which Lincoln separately earned undisclosed spread income, and the Inspira Defendants retained both Lincoln and the Stable Value Account notwithstanding the lower-cost alternatives their own RFP identified.

81. Lincoln's recordkeeping compensation was charged as a percentage of Plan assets rather than as a flat per-participant fee, so it rose automatically as Plan assets grew, without any corresponding increase in services. The Plan deducted a "quarterly plan level wrap fee" that, as Inspira acknowledges, "Lincoln reduced … from 0.1875% to 0.1750% per quarter" only because "[t]he Plan hit a new benchmark in December 2023," not as the result of any competitive benchmarking — confirming that Lincoln's asset-based compensation moved with Plan assets rather than with the value of its services. (Lincoln 404(a) Fee Disclosure Change Notice (eff. Jan. 1, 2024); Inspira Document Request Response (Oct. 2, 2026)). That same notice confirms that the wrap fee was "offset from revenue sharing payments the plan receives from plan investment options," corroborating that Lincoln received undisclosed revenue sharing. (Lincoln 404(a) Fee Disclosure Change Notice (eff. Jan. 1, 2024)).

82. The Inspira Defendants' fee monitoring compounded, rather than cured, this failure. The "all-in" weighted-average expense figure their adviser reported — approximately 0.39% — was expressly calculated "excluding fixed account," meaning the substantial spread income Lincoln earned on the roughly $77 million held in the Stable Value Account was omitted from the very benchmark on which the Inspira Defendants relied to judge the reasonableness of the Plan's costs. (CapTrust 2nd Quarter 2024 Review; CapTrust 3rd Quarter 2024 Review). The

Inspira Defendants thus never assessed the reasonableness of Lincoln's total compensation from all sources, as ERISA requires.

83. Lincoln provided these recordkeeping services under a Restated Recordkeeping Service Agreement effective April 1, 2021, which restated an original agreement dated September 1, 2015. (Lincoln Recordkeeping Service Agreement (eff. Apr. 1, 2021)). Under that agreement, Inspira agreed to "fund future contributions to the Plan exclusively through the Program," through which Lincoln made available its own affiliated "stable value fund and/or group annuities issued by The Lincoln National Life Insurance Company," while Lincoln expressly disclaimed "any … liability with respect to claims of breach of fiduciary duty for … the inclusion, exclusion, or deletion of Investments in the Program, … monitoring of such Investments …, or … providing the Recordkeeping Services." (Lincoln Recordkeeping Service Agreement (eff. Apr. 1, 2021)). The duty to monitor Lincoln's compensation and the prudence of its affiliated products therefore rested entirely with the Inspira Defendants.

84. The Plan reported the following direct compensation paid to Lincoln on its Forms 5500. That direct compensation, however, was only part of what Lincoln received. When Lincoln's indirect compensation — chiefly the spread income it earned on the Stable Value Account — is added, Lincoln's total compensation for recordkeeping and related services was many times the approximately $35 per

participant that a prudent fiduciary of a plan this size could have negotiated, as set forth in Table 9. Because the Plan's filings do not state the spread, the indirect figure below is a deliberately conservative estimate — one percent of the Stable Value Account's year-end balance — and does not include the additional float income and revenue sharing Lincoln also received:

**Table 9**

| Plan Year | Direct Compensation to Lincoln | Estimated Indirect Compensation (Spread Income on SVA) | Estimated Total Lincoln Compensation | Participants | Estimated Total Compensation Per Participant |
|---|---|---|---|---|---|
| FY 2020 | $284,628 | $716,275 | $1,000,903 | 7,326 | $136.62 |
| FY 2021 | $407,671 | $734,448 | $1,142,119 | 7,814 | $146.16 |
| FY 2022 | $373,966 | $760,560 | $1,134,526 | 8,386 | $135.29 |
| FY 2023 | $389,736 | $762,843 | $1,152,579 | 9,883 | $116.62 |

<u>Sources</u>: Direct compensation and participant counts — Forms 5500, Schedule C (Form 5500 (2020) at 10; Form 5500 (2021) at 10; Form 5500 (2022) at 10; Form 5500 (2023) (2) at 10). Estimated Indirect Compensation is a conservative estimate of the spread income Lincoln earned on the Stable Value Account, computed at one percent of the Account's end-of-year contract value (Form 5500 (2020) at 26; Form 5500 (2021) at 27; Form 5500 (2022) at 27; Form 5500 (2023) (2) at 28); the actual spread, and Lincoln's additional indirect compensation from *float income* and *revenue sharing*, are not stated in the Plan's filings and are subject to proof after discovery. Estimated Total Lincoln Compensation is the sum of direct compensation and estimated spread income.

85. These figures reflect only the direct compensation the Plan reported. On each of its Forms 5500 for 2020 through 2023, the Plan reported that Lincoln received no indirect compensation. That representation cannot be reconciled with the economic realities of Lincoln's arrangement with the Plan, and the Inspira Defendants failed to identify, quantify, and account for the substantial indirect compensation Lincoln in fact received.

86. *Spread income.* By holding the Stable Value Account's assets — which grew to more than $76 million — in its general account and paying participants a below-market crediting rate, Lincoln earned spread income each year. As reflected in Table 9, even a conservative one-percent spread on the Account's year-end balance yielded an estimated $716,275 to $762,843 for Lincoln in each year of the Class Period — roughly two to three times the direct recordkeeping compensation the Plan reported. The actual spread was likely greater, because competing providers credited participants two to four percentage points more than Lincoln did, as shown in Tables 2 and 5; the precise amount is known only to Lincoln and is subject to proof after discovery.

87. *Float income.* Upon information and belief, Plan contributions and distributions pass through a Lincoln clearing account, and Lincoln retains the interest and investment returns earned on Plan money while it is held in that account. Lincoln's own 408(b)(2) disclosure confirms the arrangement: Plan contributions and distributions pass through an omnibus bank account that earns "banking credits" computed at the federal funds rate, and any "banking credits earned over and above the banking charges and other charges" are retained rather than credited to the Plan. (Lincoln 408(b)(2) Disclosure) This "float" is a form of indirect compensation that a prudent fiduciary must negotiate, monitor, and count toward the recordkeeper's total compensation. *See* U.S. Dep't of Labor Field Assistance Bulletin No. 2002-03.

88. *Revenue sharing.* Lincoln also received revenue-sharing payments from the Plan's investment options, calculated as a percentage of Plan assets, further increasing its total compensation without any corresponding increase in services. Lincoln's 408(b)(2) disclosure confirms that it receives 12b-1 and sub-transfer-agency fees from the Plan's mutual funds "in return for recordkeeping services," and that it treats such revenue sharing as a component of its required compensation — explaining that if "the average revenue sharing we receive from investments is 20 basis points and we apply an asset charge of 15 basis points, our gross quote for the plan is 35 basis points." (Lincoln 408(b)(2) Disclosure). Lincoln also receives revenue sharing on the Group Fixed Annuity contract that supports the Stable Value Account. (Lincoln 408(b)(2) Disclosure).

89. Because recordkeeping costs do not increase materially with plan assets, asset-based and undisclosed forms of compensation cause a recordkeeper's total compensation to rise without any corresponding increase in the value of services. The Inspira Defendants were required to consider all of Lincoln's direct and indirect compensation together in determining whether Lincoln's total compensation was reasonable, and to benchmark and competitively bid the Plan's recordkeeping. They failed to do so, and as a result the Plan paid Lincoln unreasonable compensation, to the detriment of participants.

### D. Inspira Improperly and Disloyally Used Participant Forfeitures to Fund Plan Contributions Instead of Defraying Plan Expenses

90. When a participant terminates employment before becoming fully vested, the nonvested portion of the participant's employer and matching contributions is forfeited and remains in the Plan's trust. These forfeited amounts remain Plan assets.

91. Under the Plan's governing documents, the Employer may direct how forfeitures are applied: they may be reallocated as additional contributions, used to reduce the Employer's own contributions, or used to pay Plan expenses. (403(b) Plan Basic Plan Document at 77; 403(b) Plan Basic Plan Document at 78; 403(b) Plan Basic Plan Document at 78). Inspira confirms that the executed Adoption Agreement expressly authorizes the competing use it declined to make: "Pursuant to Section 8-6 of the Adoption Agreement for the Plan, forfeitures may be used to offset Plan expenses." (Inspira Document Request Response (Oct. 2, 2026)).

92. The Inspira Defendants exercised discretionary authority or control over the management and administration of the Plan and the management or disposition of Plan assets, and each is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii). Because the choice concerns the management and disposition of Plan assets, the Inspira Defendants acted as fiduciaries — not as a settlor engaged in plan design — when they decided how to apply the Plan's forfeitures. *See Rodriguez*, 744 F. Supp. 3d at 943.

93. In fact, according to the Plan's 5500 filing for 2024 and the most recent version of the Plan's Summary Plan Description ("SPD"), the Inspira Defendants were instructed to first consider payment of plan expenses before using forfeited assets to reduce their contributions. The SPD states, at page 13, that if "benefits are forfeited, those forfeited amounts may first be used to pay any Plan expenses" and, "[i]f any forfeitures remain after paying Plan expenses, such forfeited amounts will be used to offset other Employer Contributions . . . ." Similarly, the Plan's 5500 filing for 2024 states, at page 7, "[f]orfeiture of nonvested matching employer contributions may first be used to pay any plan expenses. If not used for expenses, then forfeitures will be used to offset other employer contributions under the plan for the plan year in which the forfeiture occurs. During 2024, employer contributions were reduced by $1,433,742, from forfeited nonvested accounts . . . ."

94. The Plan thus required the Inspira Defendants to first consider whether it is prudent to apply forfeited assets to cover Plan expenses. Only after making this fiduciary decision could Defendants look into the option of using forfeitures to reduce Inspira's contributions. In the documents made available to Plaintiffs before this lawsuit was filed, the Inspira Defendants provided no evidence that they first weighed the prudence of covering Plan expenses, as the Plan requires, before allocating these funds to reduce Inspira's contributions.

95. Inspira occupied dueling roles as both the Plan's administrator and the entity funding the Plan. Every forfeiture dollar applied to offset Inspira's own employer and matching contribution obligations was a dollar Inspira did not have to contribute to the trust, giving it a direct, non-trivial financial incentive to choose that use. The competing use—defraying the recordkeeping and administrative expenses otherwise deducted from participants' accounts—would have directly increased participants' account balances.

96. The Plan's size and economics made the competing use material. During the Class Period, the Plan held more than half a billion dollars in assets and covered up to 9,883 participants, and the recordkeeping and administrative compensation described in Section C above was substantial. Upon information and belief, the forfeitures available in each relevant year were sufficient to defray a material portion of the expenses charged to participants' accounts. The Plan's recordkeeping arrangement provided a ready mechanism to return such amounts to participants: under that arrangement, an expense reimbursement account "may be used to pay Qualified Plan Expenses or re-allocated back to Plan participants." (Cammack RFP Finalist Comparison Report at 35). The Inspira Defendants were aware that forfeiture balances were material and available: the ERISA Benefit Committee specifically placed the "403b Forfeiture and Fee Account" on its January 30, 2025 meeting agenda and "Plan Forfeiture Balances" on its October 10, 2025

meeting agenda. (ERISA Benefit Committee Agenda (Jan. 30, 2025); ERISA Benefit Committee Agenda (Oct. 10, 2025)).

97. Upon information and belief, the Inspira Defendants exercised that discretion in each and every year of the Class Period to use all or substantially all forfeitures to reduce Inspira's own employer and matching contribution obligations, and applied none of the forfeitures to defray the recordkeeping and administrative expenses charged to participants' accounts. That choice saved Inspira money at the direct expense of the Plan and its participants, who were forced to bear administrative charges that the forfeitures could have defrayed. The consistent management of Plan assets in congruence with the fiduciary's own financial interest over a sustained period is itself probative of disloyalty.

98. In making that choice, the Inspira Defendants undertook no reasoned or impartial decision-making process. They did not investigate the merits of the alternative permissible uses; evaluate whether there was any risk that Inspira would default on or be unable to meet its contribution obligations if forfeitures were applied to Plan expenses; evaluate whether forfeitures were sufficient both to defray expenses charged to participants' accounts and to offset a portion of Inspira's contributions; consult any independent, non-conflicted decisionmaker or adviser; or conduct any explicit inquiry into the conflict of interest the decision presented.

99. Instead, the Inspira Defendants made the allocation at Inspira's direction rather than through any deliberation by the Administrative Committee acting in its fiduciary capacity. The duty of prudence and the duty of loyalty to act solely in participants' interest trump the discretion afforded by the plan document, and the Inspira Defendants may not invoke the Plan's terms to excuse conduct that benefited Inspira at participants' expense.

100. Inspira was at all relevant times in sound financial condition and was under no risk of defaulting on or being unable to meet its contribution obligations to the Plan. No circumstance prevailing at the time of any annual allocation therefore made offsetting Inspira's own contributions the better choice for participants.

101. By substituting Plan assets for contributions it was otherwise obligated to make, Inspira dealt with the assets of the Plan in its own interest and for its own account, in express violation of 29 U.S.C. § 1106(b)(1).

102. As a direct and proximate result, the Plan suffered a loss equal to the amount of forfeited Plan assets substituted for Inspira's contribution obligations, together with the investment returns those amounts would have earned. Separately, participants bore recordkeeping and administrative charges deducted from their accounts that the forfeitures could have defrayed. A participant in a defined contribution plan is entitled to "the value of his account unencumbered by any fiduciary impropriety." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 297 (3d Cir.

2007). The Inspira Defendants' fiduciary breaches caused these losses to the Plan and satisfy the loss-causation element of an ERISA fiduciary-duty claim. *See Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 184 (3d Cir. 2024).

**E. The Inspira Defendants Breached the Duty of Loyalty**

103. ERISA's duty of loyalty requires a fiduciary to act solely in the interest of participants and beneficiaries and for the exclusive purpose of providing them financial benefits and defraying reasonable plan expenses, with an "eye single" to their interests and excluding all consideration of the interests of third persons. 29 U.S.C. § 1104(a)(1)(A).

104. The Inspira Defendants repeatedly subordinated participants' interests to those of Inspira and Lincoln: they retained a general-account stable value product that enriched Lincoln through undisclosed spread income; they allowed Lincoln to collect excessive and undisclosed compensation; and they used Plan forfeitures to reduce Inspira's own contribution obligations rather than to reduce participants' expenses, making the same self-interested election year after year despite the conflict. Each decision benefited a party other than the participants and breached the duty of loyalty.

**F. Inspira Failed to Fund the Plan with Contributions Owed on Wages It Unlawfully Failed to Pay**

105. Employee salary deferrals and employer matching and other contributions under the Plan are calculated as a percentage of each participant's

compensation. As Inspira has confirmed, the Plan provides a matching contribution equal to "fifty percent (50%) of the first four percent (4%)" of eligible deferrals and an employer nonelective contribution of "three percent (3%) or four percent (4%) of compensation," with an enhanced nonelective contribution for certain participants. (Inspira Document Request Response (Oct. 2, 2026)). Because each of these contributions is measured as a percentage of compensation, when Inspira underpaid wages owed to Plan participants, it necessarily underfunded the corresponding salary deferrals and employer contributions.

106. Three separate actions establish that Inspira systematically underpaid its hourly employees in violation of the FLSA and New Jersey wage-and-hour law.

107. *The Deichert Action.* In *Daniel Deichert and Donna McKendry v. Inspira Health Network, Inc.*, No. CUM-L-000269-25 (N.J. Super. Ct.), the plaintiffs allege that Inspira violated the FLSA and New Jersey wage-payment laws through unlawful timeclock rounding, automatic meal-period deductions regardless of whether breaks were taken, and uncompensated pre- and post-shift work by emergency-room nurses. (Deichert and McKendry Complaint) The action asserts a New Jersey Employee Class and an ER Nurse Subclass covering the six years preceding April 16, 2025.

108. As a result of these practices, Inspira failed to pay named plaintiffs and other hourly employees for all hours worked and all overtime, which in turn reduced the contributions credited to their Plan accounts.

109. *The Erbayri Action.* In *Ali Erbayri v. Inspira Medical Centers, Inc.*, No. CUM-L-000261-24 (N.J. Super. Ct.), the court certified a class on July 7, 2025, of all EMT and paramedic supervisor employees who worked more than forty hours in at least one workweek within the six years preceding the action and were paid "straight time for overtime." (Erbayri v. Inspira Medical Centers Settlement Agreement § 1) The class consists of 25 members, and Inspira agreed to a settlement fund of $600,000 to resolve claims under the New Jersey Wage and Hour Law, the New Jersey Wage Payment Law, and the FLSA. (Erbayri v. Inspira Medical Centers Settlement Agreement § 1) Because these employees were underpaid overtime, their Plan contributions were likewise underfunded.

110. *The Oatman Action.* In *Christina Oatman v. Inspira Medical Centers, Inc.*, No. 1:25-cv-1695 (D.N.J.), paramedics allege that Inspira failed to pay their regular and overtime wages for time spent preparing and teaching certification courses, for which they were paid only a flat rate of $300 per class ($350 for lead instructors), in violation of the FLSA and New Jersey wage-payment laws. These underpayments likewise reduced the affected participants' Plan contributions.

111. As alleged in the Deichert, Erbayri, and Oatman Actions, Inspira underpaid its employees and thereby caused the Plan to be underfunded, both as to employee salary deferrals and as to Inspira's matching and other employer contributions. The amounts that should have been contributed to the Plan on the unpaid wages are measured by the Plan's definition of compensation, and Inspira must make the Plan whole for those missing contributions. *See Longo v. Trojan Horse Ltd.*, 208 F. Supp. 3d 700, 706-08 (E.D.N.C. 2016) (holding unpaid plan contributions to be plan assets where the plan defined compensation to include them, and holding the fiduciary liable under 29 U.S.C. § 1109(a) to make the plan whole for the missing contributions).

## **CLASS ACTION ALLEGATIONS**

112. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan and the following Class: All current and former participants in and beneficiaries of the Inspira Health Network 403(b) Savings Plan at any time from six years before the filing of this Complaint through the date of judgment, excluding the Inspira Defendants and their immediate families.

113. *Numerosity.* The Class is so numerous that joinder is impracticable. As of December 31, 2023, the Plan had 9,883 participants.

114. *Commonality.* Common questions of law and fact predominate, including whether the Inspira Defendants are fiduciaries; whether they breached

their duties of prudence and loyalty in selecting and retaining the Challenged Investments; whether they failed to monitor and control Lincoln's compensation; whether they improperly used Plan forfeitures; whether they caused prohibited transactions; whether Inspira must make good the Plan's underfunded contributions; and the appropriate measure of Plan-wide relief.

115. *Typicality.* Plaintiffs' claims are typical of the Class because they arise from the same course of conduct and the same legal theories that apply to all Class members.

116. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class, have no conflicts with the Class, and have retained counsel experienced in ERISA class litigation.

117. *Superiority.* Because the relief sought under 29 U.S.C. §§ 1109(a) and 1132(a)(2) is owed to the Plan as a whole, a class action is the superior method for adjudicating this controversy, and certification is appropriate under Rule 23(b)(1).

## COUNT I
**Breach of the Duty of Prudence — Imprudent Investments**
**(Against All Inspira Defendants)**

118. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

119. The Inspira Defendants were obligated to discharge their duties with the care, skill, prudence, and diligence of a prudent fiduciary. 29 U.S.C. §

1104(a)(1)(B). This included a continuing duty to evaluate and monitor each of the Plan's investment options using accepted, risk-adjusted measures and to remove imprudent options within a reasonable time. *See Hughes*, 595 U.S. at 176; *In re Quest Diagnostics*, 179 F.4th at 224-25.

120. The Inspira Defendants breached that duty by selecting and retaining the Challenged Investments — the Lincoln Stable Value Account, the American Century Small Cap Value Fund, the MFS Mid Cap Value Fund, and the Western Asset Core Plus Bond Fund — which imposed excessive risk and, for the actively managed funds, delivered negative risk-adjusted returns, and by failing to employ a prudent process to identify and adopt superior alternatives. *See Mator*, 102 F.4th at 184.

121. As a direct and proximate result, the Plan and its participants suffered losses in the form of unnecessary risk, diminished returns, and reduced account balances. The Inspira Defendants are liable under 29 U.S.C. § 1109(a) to make good those losses and are liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## <u>COUNT II</u>
## Breach of the Duties of Prudence — Excessive Compensation
## (Against Inspira and the Board)

122. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

123. Inspira and the Board were required to ensure that the Plan paid no more than reasonable compensation to Lincoln and to defray only reasonable Plan expenses. 29 U.S.C. § 1104(a)(1)(A)(ii). This required them to consider all of Lincoln's direct and indirect compensation, to benchmark that compensation against comparable plans, and to subject the Plan's recordkeeping to periodic competitive bidding. *See Bugielski*, 76 F.4th at 912; *Mator*, 102 F.4th at 185-86.

124. Inspira and the Board breached those duties by allowing Lincoln to receive excessive direct compensation and substantial undisclosed indirect compensation — including spread income on the Stable Value Account, float income, and revenue sharing — without monitoring, quantifying, or controlling it.

125. As a direct and proximate result, the Plan and its participants paid unreasonable recordkeeping and administrative fees. Inspira and the Board are liable under 29 U.S.C. § 1109(a) and for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
## Prohibited Transactions with a Party in Interest
## (Against Inspira and the Administrative Committee)

126. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

127. Lincoln is a party in interest as a provider of services to the Plan. 29 U.S.C. § 1002(14).

128. Inspira and the Administrative Committee caused the Plan to engage in transactions constituting a direct or indirect furnishing of services between the Plan and Lincoln and a use of Plan assets by and for the benefit of Lincoln, including through the Stable Value Account and the payment of unreasonable direct and indirect compensation to Lincoln. 29 U.S.C. § 1106(a)(1). Because Lincoln received more than reasonable compensation, these transactions are not exempt under 29 U.S.C. § 1108(b)(2). *See Bugielski*, 76 F.4th at 912.

129. Inspira and the Administrative Committee are liable under 29 U.S.C. § 1109(a) to restore to the Plan all losses and to disgorge all compensation and profits Lincoln received in connection with the prohibited transactions, and are liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**

**Breach of the Duties of Loyalty and Prudence, Prohibited Use of Plan Assets, and Self-Dealing Under 29 U.S.C. § 1106(b)(1) — Participant Forfeitures (Against All Inspira Defendants)**

130. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

131. Plan forfeitures are Plan assets, and the Inspira Defendants acted as fiduciaries in deciding how to apply them. The Inspira Defendants exercised discretionary authority or control over the management and administration of the Plan and the management or disposition of Plan assets, and each is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii). Because the choice concerns

the management and disposition of Plan assets, the Inspira Defendants acted as fiduciaries — not as a settlor engaged in plan design — when they decided how to apply the Plan's forfeitures.

132. The Inspira Defendants breached their duties of loyalty and prudence, and caused Plan assets to inure to Inspira's benefit and to be used for the benefit of a party in interest, by using forfeitures to reduce Inspira's own contribution obligations rather than to defray the expenses charged to participants' accounts. They undertook no reasoned or impartial process: they did not investigate the alternative permissible uses, assess whether Inspira faced any risk of defaulting on or being unable to meet its contribution obligations if forfeitures were used for Plan expenses, consult an independent, non-conflicted adviser or decisionmaker, or conduct any inquiry into the conflict presented by their choice. The decision was made at Inspira's direction rather than through deliberation by the Administrative Committee acting in its fiduciary capacity. *See Struble*, 732 F.2d at 334-35; *Sweda*, 923 F.3d at 328-29. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A)–(B), 1106(a)(1), 1106(b). *See Rodriguez*, 744 F. Supp. 3d at 944, 948-49.

133. By using forfeited Plan assets to substitute for contributions Inspira was otherwise obligated to make, Inspira dealt with the assets of the Plan in its own interest and for its own account in violation of 29 U.S.C. § 1106(b)(1). Section 1106(b)(1) categorically prohibits that self-dealing; liability does not depend on a

showing that the transaction was unfair, unreasonable, or otherwise tainted. Plan terms cannot authorize what 29 U.S.C. § 1104(a)(1)(D) forbids.

134. As a direct and proximate result, the Plan and its participants suffered losses equal to the forfeited Plan assets substituted for Inspira's contribution obligations, together with the investment returns those amounts would have generated, and participants bore avoidable recordkeeping and administrative expenses that the forfeitures could have defrayed. The Inspira Defendants are liable under 29 U.S.C. § 1109(a) to make good those losses and to restore the amounts by which Inspira's contribution obligations were improperly reduced, and are liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT V
**Breach of Fiduciary Duty — Failure to Fund the Plan for Underpaid Wages**
**(Against Inspira and the Administrative Committee)**

135. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

136. Because Plan contributions are measured as a percentage of compensation, Inspira's unlawful failure to pay wages owed to Plan participants, as alleged in the Deichert, Erbayri, and Oatman Actions, caused the Plan to be underfunded with respect to both employee salary deferrals and employer matching and other contributions.

137. The amounts that should have been contributed on the unpaid wages are measured by the Plan's definition of compensation, and Inspira and the Administrative Committee are obligated to make the Plan whole for those missing contributions. *See Longo*, 208 F. Supp. 3d at 706-08.

138. Inspira and the Administrative Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan the underfunded contributions, together with the investment earnings those contributions would have generated, and are liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a). In the alternative, the affected participants are entitled to the unpaid contributions as benefits due under 29 U.S.C. § 1132(a)(1)(B). *See In re Brobeck, Phleger & Harrison, LLP*, 414 B.R. 627, 638-39 (Bankr. N.D. Cal. 2009) (recognizing that a participant in a defined contribution plan may recover unpaid employer contributions as benefits due under 29 U.S.C. § 1132(a)(1)(B)).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the Plan and the Class, respectfully request that the Court:

(a) Certify the Class under Rule 23, appoint Plaintiffs as Class Representatives, and appoint their counsel as Class Counsel;

(b) Declare that the Inspira Defendants breached their fiduciary duties and engaged in prohibited transactions as alleged;

(c) Order the Inspira Defendants to make good to the Plan all losses resulting from their breaches and prohibited transactions, and to restore to the Plan all profits and compensation improperly obtained, under 29 U.S.C. § 1109(a);

(d) Order Inspira to make good to the Plan all contributions that were underfunded as a result of its wage-and-hour violations, together with lost earnings;

(e) Order disgorgement of all amounts by which Inspira improperly reduced its contribution obligations through the use of Plan forfeitures; restore to the Plan the forfeited amounts substituted for Inspira's contribution obligations, together with the lost investment returns those amounts would have generated; disgorge all profits Inspira realized through the use of Plan assets under 29 U.S.C. § 1109(a); and impose a constructive trust and surcharge as appropriate;

(f) Order an accounting and such other equitable and remedial relief as is appropriate, including the removal of the breaching fiduciaries;

(g) Award Plaintiffs their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common-fund doctrine;

(h) Award pre- and post-judgment interest; and

(i) Grant such other and further relief as the Court deems just and proper.

Dated: October 27, 2026

Respectfully submitted,

/s/ Eric Lechtzin
Eric Lechtzin
(NJ Atty. ID No. 011841992)
Shoshana Savett
(NJ Atty. ID No. 042882003)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Tel.: (215) 867-2399
elechtzin@edelson-law.com
ssavett@edelson-law.com

Thomas W. Bibby
(NJ Atty. ID No. 161152017)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
900 West Morgan Street
Raleigh, NC 27603
Tel.: (610) 273-8272
tbibby@brysonpllc.com

Jimmy W. Mintz*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
201 Sevilla Ave, 2nd Floor
Coral Gables, FL 33134
jmintz@brysonpllc.com

*Attorneys for Plaintiffs and the Proposed Class*

* *Pro hac vice applications forthcoming*